UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
AT LAW AND IN ADMIRALTY

UNITED STATES OF AMERICA,

        Plaintiff,

    v.                             Case No.

APPROXIMATELY 2,005,822.786651 TETHER
(USDT) CRYPTOCURRENCY FROM
CRYPTOCURRENCY ADDRESS ENDING IN
ntSJPAPi,

        Defendant.

## VERIFIED COMPLAINT FOR CIVIL FORFEITURE IN REM

The United States of America, by its attorneys, Gregory J. Haanstad, United States Attorney for the Eastern District of Wisconsin, and Elizabeth M. Monfils, Assistant United States Attorney for this district, alleges the following in accordance with Supplemental Rule G(2) of the Federal Rules of Civil Procedure:

### Nature of the Action

1.    This is a civil action to forfeit property to the United States of America, under 18 U.S.C. §§ 981(a)(1)(A) and 984 and 21 U.S.C. § 881(a)(6), for violations of 18 U.S.C. §§ 1956, 1957, and 1960 and 21 U.S.C. §§ 841(a) and 846.

### The Defendant In Rem

2.    The defendant property, approximately 2,005,822.786651 Tether (USDT)[1] cryptocurrency from cryptocurrency address ending in ntSJPAPi, was seized on or about July 29, 2024, in Road Town, Tortola, British Virgin Islands.

---

[1] Tether, often referred to by its currency code of USDT, is a stablecoin cryptocurrency with a value meant to mirror the value of the U.S. dollar. USDT tokens are backed by offshore banks. Offshore banks offer

3.     The Drug Enforcement Administration seized the defendant property, approximately 2,005,822.786651 Tether (USDT) cryptocurrency from cryptocurrency address ending in ntSJPAPi, pursuant to seizure warrant 24-MJ-163 issued by United States Magistrate Judge William E. Duffin in the Eastern District of Wisconsin on July 29, 2024.

4.     The defendant property is presently in the custody of the United States Marshal Service in Arlington, Virginia.

## Jurisdiction and Venue

5.     This Court has subject matter jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345, and over an action for forfeiture under 28 U.S.C. § 1355(a).

6.     This Court has *in rem* jurisdiction over the defendant property under 28 U.S.C. § 1355(b).

7.     Venue is proper in this judicial district under 28 U.S.C. § 1355(b)(1) because the acts or omissions giving rise to the forfeiture occurred, at least in part, in this district.

## Basis for Forfeiture

8.     The defendant property, approximately 2,005,822.786651 Tether (USDT) cryptocurrency from cryptocurrency address ending in ntSJPAPi, is subject to forfeiture under 21 U.S.C. § 881(a)(6) because it represents proceeds of distribution of controlled substances and a conspiracy to distribute, manufacture, dispense, or possess with the intent to manufacture, distribute, or dispense controlled substances, in violation of 21 U.S.C. §§ 841(a)(1) and 846.

9.     The defendant property, approximately 2,005,822.786651 Tether (USDT) cryptocurrency from cryptocurrency address ending in ntSJPAPi, is also subject to forfeiture under 18 U.S.C. §§ 981(a)(1)(A) and 984 because (1) it was involved in, or is traceable to funds involved

---

fewer charges for operation and tax benefits, but they are not always fully secure like the FDIC-insured U.S. banks.

in, money laundering transactions and a conspiracy to engage in money laundering in violation of 18 U.S.C. §§ 1956 and 1957; and (2) it was involved in, or is traceable to funds involved in, unlicensed money transmitting in violation of 18 U.S.C. § 1960.

**Facts**

10.  Cocaine is a Schedule II controlled substance under 21 U.S.C. § 812.

**Background**

11.  Drug trafficking organizations ("DTOs") generate large amounts of cash proceeds in the United States and elsewhere. In order to repatriate their cash proceeds from the United States and other countries back to their country of origin where they can be used by the DTO members, DTOs often employ professional money launderers. For a fee, professional money launderers provide the DTO with currency in the DTO's native country in exchange for bulk currency in the country where the DTO's narcotics are distributed.

12.  Professional money launderers use a variety of methods to accomplish their goals, including trade-based money laundering, bulk currency smuggling, and virtual currency trading.

13.  Virtual currency, also known as cryptocurrency, is generally defined as an electronically sourced unit of value that can be purchased with, sold for, or used as a substitute for fiat currency (i.e., currency created and regulated by a government). Cryptocurrency is not issued by any government, bank, or (with limited exceptions) companies. It is instead generated and controlled through computer software operating on a decentralized peer-to-peer network.

14.  Cryptocurrency can be quickly transmitted directly between parties and across national borders, without the need for a facilitating third party like a traditional financial institution. Many cryptocurrencies, including Bitcoin and Tether, operate via a "blockchain," a record (or ledger) of every transaction ever conducted that is distributed throughout the network. The blockchain will not list the names of parties to the transaction but will list the date and time

3

of the transaction, the originating and receiving public address, and how much cryptocurrency was transferred.

15.     Based on their training and experience, and their knowledge and information garnered from money launderers in this case and similar cases, agents know that cryptocurrency transactions are often used to launder the proceeds derived from narcotic traffickers. More specifically,

> A.     Narcotics traffickers in source countries (e.g., Mexico and Colombia) provide narcotics to consumer countries (e.g., the United States).

> B.     The bulk currency proceeds derived from the sale of these narcotics are then returned to the narcotics traffickers within the source countries using various methods, including the use of cryptocurrencies. In this case, the narcotics traffickers often contacted brokers, or professional money launderers, who were responsible for collecting the bulk currency within the consumer countries and depositing the currency into the U.S. banking system.

> C.     The brokers often then paid out the narcotics traffickers in fiat currency within the source countries, minus a commission, and sold the cryptocurrency to a separate "crypto" broker. The commission fee was generally between three percent and five percent.

> D.     The cryptocurrency broker may have then conducted a series of cryptocurrency transactions across multiple cryptocurrency exchanges using an array of methods (e.g., cryptocurrency scrambler) in an effort to obfuscate the true origin of the money. The cryptocurrency brokers often then sold the cryptocurrency in the "black market" in exchange for various fiat currencies.

**International drug trafficking and money laundering organization**

16.     In August 2020, agents received a tip regarding possible international drug trafficking and tax evasion. The tip included, in part, the following information:

> A.     An individual having the initials D.C. was identified as one of the persons involved in drug trafficking.

> B.     D.C. had been imprisoned for federal drug charges in the past.

> C.     D.C. was living a lavish lifestyle, clearly beyond D.C.'s means.

4

D.     Individuals involved in drug trafficking were using a business called S&C Trucking LLC, 1XXX East Lafayette Place #3XX, Milwaukee, Wisconsin,[2] to hide drug proceeds.[3]

E.     D.C. operated S&C Trucking LLC located in Milwaukee, Wisconsin. The business was registered with the DOT [Wisconsin Department of Transportation] under a different address that is a home, but it actually operated at 5XXX West Clinton Avenue, Milwaukee, Wisconsin.

17.     According to Wisconsin Department of Financial Institutions records, D.C. was the registered agent of S&C Trucking LLC.  The address listed for the business was 9XXX West Tower Avenue, Milwaukee, Wisconsin (the "Tower Avenue residence"). Agents conducted surveillance at the Tower Avenue residence on several occasions and never saw a person or vehicle come or go from the residence. Agents also observed that cameras were mounted on the exterior of the Tower Avenue residence and that all of the window blinds of the residence were closed.

18.     Based on their training and experience, agents know that drug traffickers frequently maintain "stash" houses which are residences used to store drugs before distribution and/or to store proceeds of drug sales after distribution. These residences typically have little vehicle or pedestrian traffic to avoid drawing attention to the house.  In addition, cameras are often mounted to the exterior of "stash" houses to allow the drug traffickers to observe whether the residence was being approached by law enforcement or by rival drug traffickers.

19.     On October 20, 2020, Texas Department of Public Safety investigators were conducting surveillance at a suspicious business in Pharr, Texas.  An overhead garage door at the business warehouse was open and investigators saw a pallet containing several boxes sitting next to a pickup truck in the business.  The rest of the warehouse appeared to be empty.

---

[2] This address is for a condominium unit.

[3] Throughout this complaint, certain information has been redacted using the letter "X" as a means of avoiding the revelation of any personal information.

5

A.     A truck belonging to Estes Express Lines arrived, loaded the pallet onto the truck, and left the business. Investigators maintained surveillance on the truck until it arrived at the Estes Express Lines property.

B.     Investigators approached the employees of Estes Express Lines and inquired about the pallet. Employees provided investigators with the bill of lading related to the shipment. The bill of lading indicated that the pallet contained 492 pounds of optical cable and was being shipped from Dixie Cable, 2003 North Veterans Boulevard, Suite 18, Pharr, Texas, to an individual having the initials R.G. at 1850 North Doctor Martin Luther King Jr. Drive #210, Milwaukee, Wisconsin. The shipper name was listed as an individual having the initials C.T. with phone number (956) 996-2XXX. The recipient was listed as R.G. with phone number (657) 261-1XXX.

C.     A drug detection canine gave a positive alert to the odor of a controlled substance on the pallet. Investigators searched the pallet and found approximately 60 kilograms of cocaine concealed within the boxes on the pallet.

20.     According to shipping records, three prior shipments had been sent from Pharr, Texas, addressed to 1850 North Doctor Martin Luther King Jr. Drive #210, Milwaukee, Wisconsin. Two of those shipments had been picked up at the shipping company's location in Milwaukee, Wisconsin. One shipment was delivered to 1850 North Doctor Martin Luther King Jr. Drive #210, Milwaukee, Wisconsin on August 14, 2020. Surveillance regarding the August 14, 2020, shipment revealed the following:

A.     Surveillance video from North Shore Bank[4] showed that on August 14, 2020, D.C. arrived at the side of the business located at 1850 North Martin Luther King Jr. Drive in a black Dodge Ram 2500 pickup. The bed of the pickup was empty upon D.C.'s arrival.

B.     A short time later, a box truck driven by the shipping contractor arrived and parked on the side of the business.

C.     D.C. positioned the Dodge Ram near the shipping company vehicle.

D.     A short time later, D.C. drove away from the area. The bed of the Dodge Ram now contained what appeared to be a shipping pallet containing several cardboard boxes. This pallet was similar in appearance to the pallet seized in Pharr, Texas, on October 20, 2020.

---

[4] North Shore Bank is located at 1900 North Doctor Martin Luther King Jr. Drive, Milwaukee, Wisconsin, which is across the street from 1850 North Martin Luther King Jr. Drive, Milwaukee, Wisconsin.

21.     Wisconsin Department of Financial Institutions records showed that Peachy Clean Commercial and Construction Cleaning LLC listed its office address as 1850 North Doctor Martin Luther King Jr. Drive #210, Milwaukee, Wisconsin.  The registered agent was an individual having the initials R.T. Numerous law enforcement database searches identified R.T.'s phone number as (414) 803-9XXX.

22.     AT&T records related to phone number (414) 469-6XXX show the subscriber as D.C. at 9XXX West Tower Avenue, Milwaukee, Wisconsin (the Tower Avenue residence).

    A.     Phone records for (414) 469-6XXX further show that D.C. was in contact with (414) 803-9XXX, the number used by R.T., 153 times from March 5, 2020, through October 8, 2020.

    B.     Phone records for (414) 469-6XXX further show that D.C. was in regular and frequent contact with other phones known to be used by drug traffickers in the Milwaukee, Wisconsin, area.

23.     On November 2, 2020, the Honorable William E. Duffin, United States Magistrate Judge in the Eastern District of Wisconsin, signed a tracking warrant for a silver 2015 Kia Optima, bearing Wisconsin license plates ACV-2XXX (the "Kia"), known to be driven by D.C.

24.     On November 24, 2020, agents saw that the Kia left the Tower Avenue residence and traveled directly to a vacant lot in the 4700 block of South Packard Avenue, Cudahy, Wisconsin.  Agents responded to that area to conduct surveillance of the Kia.

    A.     At approximately 3:27 p.m., agents saw that the Kia travelled to the parking lot of a BMO Harris Bank located at 4677 South Packard Avenue, Cudahy, Wisconsin.

    B.     Agents conducted surveillance of the Kia and saw D.C. in the driver's seat and an unidentified male in the front passenger seat. The unidentified male appeared to be looking down at the passenger-side floorboard.

    C.     At approximately 3:35 p.m., the Kia drove out of the BMO Harris parking lot and drove back to the 4700 block of South Packard Avenue.  The Kia did a U-turn and pulled to the curb on the south side of the street.  The unidentified male exited the front passenger seat and retrieved a small rolling suitcase and a small duffel bag from the vehicle.  The unidentified

7

male then entered the JP Morgan Chase Bank at 4702 South Packard Avenue, Cudahy, Wisconsin. D.C. then drove the Kia out of the area.

D.      Inside JP Morgan Chase Bank, the unidentified male approached a teller window and appeared to be conducting a lengthy transaction. At approximately 4:34 p.m., the unidentified male exited the bank and stood in front of the bank looking at his cellular phone.

E.      At approximately 4:42 p.m., a vehicle displaying an Uber sticker arrived in front of JP Morgan Chase Bank. The unidentified male opened the rear cargo area of the vehicle and placed the suitcase and the duffel bag into the vehicle. Agents followed the vehicle to the Hilton Garden Inn – Milwaukee Airport located at 5890 South Howell Avenue, Milwaukee, Wisconsin, where the unidentified male exited the vehicle and entered the hotel.

25.     According to JP Morgan Chase Bank records, on November 24, 2020, the unidentified male had made a cash deposit totaling $169,650 in United States currency to an account held by Redzien, LLC, a business organized in the State of Florida.

26.     The authorized signers on the Redzien, LLC account were individuals having the initials K.M. and H.M.T.V. Banking records for the Redzien, LLC account show that the account was opened on September 23, 2020.

27.     A search of Florida corporation records identified the registered agent for Redzien, LLC as K.M. of 10XXX West Sample Road #4XXX, Coral Springs, Florida. The Articles of Organization for Redzien, LLC identify K.M. and H.M.V. (a.k.a. H.M.T.V.), as managers of the LLC.[5]

28.     Banking records identified K.M.'s phone number as (941) 809-5XXX and H.M.T.V.'s phone number as (832) 212-3XXX. T-Mobile records show the subscriber to (941) 809-5XXX was Conceptual Design & Consulting Srvcs Inc. in North Venice, Florida, and the customer's name as "MXXXXX" (the last name of K.M.). T-Mobile records showed the subscriber to (832) 212-3XXX as "HXXXXX TXXXX" (a portion of the name of H.M.T.V.) in

---

[5] Records further show that Redzien, LLC was administratively dissolved on September 24, 2021.

Sanford, Florida. Telephone records further show that K.M., using (941) 809-5XXX, was in regular and frequent contact with H.M.T.V., using (832) 212-3XXX.

29. Bank records show that Redzien, LLC had also opened bank accounts at Bank of America, Wells Fargo Bank, and Regions Bank. Records from those three banks and JP Morgan Chase Bank show approximately 106 suspicious transactions totaling $21,268,257 from June 18, 2020, through March 24, 2021. These transactions occurred in at least twenty-one different states, including Wisconsin.

30. On January 20, 2021, agents spoke to a representative of Bank of America's Global Financial Crimes Investigations – Anti-Money Laundering department. The representative advised that from November 23, 2020, through January 5, 2021, K.M. and H.M.T.V. had deposited approximately $1,000,000 into accounts at Bank of America. Bank of America subsequently closed those accounts due to suspicions that the accounts were being used for money laundering.

31. Records show that soon after these deposits were made, money was wired out of the accounts to brokerage accounts of companies in Mexico and the British Virgin Islands. The brokerage firms that received these wires had previously been identified as being involved in money laundering in numerous drug trafficking and money laundering investigations being conducted by the Drug Enforcement Administration ("DEA"). Furthermore, agents had identified a large amount of cryptocurrency deposits and subsequent transactions made by H.M.T.V. on the cryptocurrency exchange Binance.

32. According to records at the Hilton Garden Inn – Milwaukee Airport, K.M. had rented room 339 for one night on November 24, 2020. K.M. checked into the room at approximately 4:52 p.m., the same time that the agents had observed the Uber drop the unidentified male off at the hotel. K.M. had checked out of the hotel at approximately 3:42 a.m. on November 25, 2020.

33.     Based on their training and experience, and the investigation to date, agents believe – based on the numerous large cash deposits followed by wire transfers to foreign accounts, travel throughout the United States in furtherance of money laundering, and the lack of a legitimate business purpose for large cash transactions involving Redzien, LLC (a purported mining business) – that K.M. and H.M.T.V. were involved in laundering drug proceeds throughout the United States, including in the Eastern District of Wisconsin.

**Identification of individual having initials L.E.O.T. as leader of a drug trafficking and money laundering organization**

34.     T-Mobile records for (832) 212-3XXX, used by H.M.T.V., show that H.M.T.V. was in frequent and regular contact with Mexican phone number +52 331 278 6XXX.  Open records revealed a July 12, 2019, Facebook post by an individual having the initials L.E.O.T. who had described a lost cat and provided L.E.O.T.'s phone number as +52 331 278 6XXX therein.

35.     Open records show that L.E.O.T. was associated with Grupo Gueratti, an investment management company based in Guadalajara, Jalisco, Mexico.  Records also show that L.E.O.T. was associated with Twitter account @netogXXXXXXX, an account that frequently discussed and promoted cryptocurrency, including a May 29, 2020, post stating, "The largest Crypto Exchange Worldwide. BINANCE."

36.     Based on their training and experience, and the investigation to date, agents believe L.E.O.T. was involved in cryptocurrency transactions with H.M.T.V.

37.     Beginning in approximately July 2021, a confidential source ("CS") began providing information to agents about the L.E.O.T. drug trafficking and money laundering organization ("DTMLO").

> A.     CS told investigators that L.E.O.T. was a DTMLO leader who resided in Mexico City and Guadalajara, Mexico, and had been laundering drug proceeds since at least June 2020.

B.     CS stated that in the past L.E.O.T. had asserted that L.E.O.T.'s DTMLO laundered proceeds for Colombian- and Mexican-based drug trafficking and money laundering organizations that had cells operating in countries around the world, including the United States.

C.     CS confirmed that H.M.T.V. received money pickup contracts from L.E.O.T.

38.     CS was able to insert themself as a person capable of fulfilling money pickup[6] contracts in the United States, converting bulk currency to cryptocurrency, and delivering the cryptocurrency to its desired location.

39.     In September 2021, CS began receiving money-laundering contracts from L.E.O.T. and L.E.O.T.'s sub-brokers, one of whom was an individual having the initials J.D.L.R.[7]

A.     At the direction of agents, CS organized pickups of bulk cash in various cities across the United States, which cash was then deposited into undercover Attorney General Exempt Operation ("AGEO") accounts.[8]

B.     After the bulk cash was deposited into undercover bank accounts, it was converted to stablecoin and sent to cryptocurrency deposit addresses provided by L.E.O.T. and/or J.D.L.R.

C.     In addition to CS completing money contracts on behalf of L.E.O.T. and/or J.D.L.R., information obtained from L.E.O.T. and/or J.D.L.R. money pickups resulted in multiple seizures and/or arrests.

**Money laundering contracts with CS**

40.     On or around September 15, 2021, L.E.O.T. offered CS a money laundering contract to pick up approximately $200,000 in United States currency in Dallas, Texas, convert the United States currency to USDT, and transfer it to a USDT address provided by L.E.O.T.  At

---

[6] A money pickup occurs when, in this case, a Mexico-based money broker offers a contract to someone to pick up suspected drug proceeds in the United States, minus a commission, convert it to cryptocurrency, and transfer the cryptocurrency to the money broker.

[7] CS was introduced to J.D.L.R. through L.E.O.T.

[8] AGEO accounts provide DEA the authority to conduct undercover financial transactions to infiltrate and dismantle DTMLOs.

11

the direction of agents, CS accepted the contract, and Milwaukee DEA agents coordinated with

DEA agents in Dallas, Texas, to complete the money pickup.

A.  DEA agents in Texas, using an undercover agent ("UC"), were telephonically contacted by an unknown male to arrange for the pickup. This unknown male directed the UC to a home improvement store in Dallas, Texas.

B.  On September 17, 2021, DEA agents in Texas established surveillance in the area of the pre-determined location. Surveilling agents saw a male, later identified as an individual having the initials V.J.G., exit his vehicle and provide the UC with a bag determined to contain $199,970 in United States currency.

C.  On September 17, 2021, the $199,970 received from V.J.G. was then deposited into a DEA undercover account, converted to USDT, and sent to a deposit address, as directed by L.E.O.T. through CS.

41.  On October 6, 2021, L.E.O.T. again offered a money laundering contract to CS in

Dallas, Texas. The information was passed to DEA Texas agents to assist in the pickup.

A.  On October 7, 2021, a DEA Texas UC arranged to pick up approximately $200,000 from V.J.G.

B.  V.J.G. was stopped in his vehicle en route to the money pickup for a traffic violation. A consent search of the vehicle was conducted, resulting in the seizure of $199,810 in United States currency.

C.  V.J.G. agreed to a search of his residence, resulting in the seizure of seven kilograms of cocaine and an additional $129,500 in United States currency.

42.  In September 2023, CS met with J.D.L.R. and an individual having the initials

D.A.C.R. in Bogota, Colombia, to discuss future money laundering contracts. During the meeting,

J.D.L.R. explained that J.D.L.R. was working for a group from Culiacan, Mexico, and getting the

majority of his work from D.A.C.R. D.A.C.R. told CS that D.A.C.R. was sending large amounts

of cocaine to various cities in the United States and giving customers 90 days to return the payment

through J.D.L.R. D.A.C.R. told CS that D.A.C.R. was looking for USDT transfers and cash

payouts in Guayaquil, Ecuador, among other places.

12

43.     Between about September 2021 and about April 2024, at the direction of L.E.O.T. and/or J.D.L.R., CS had conducted more than 25 money laundering contracts resulting in cryptocurrency transfers for L.E.O.T.'s DTMLO. As part of these contracts, L.E.O.T. and/or J.D.L.R. had provided CS with several USDT deposit addresses to send USDT.

**Cryptocurrency address ending in ntSJPAPi**

44.     On or around December 8, 2023, J.D.L.R. offered CS a money laundering contract to pick up approximately $60,000 in United States currency in Denver, Colorado, convert the United States currency to USDT, and transfer the USDT to a USDT address provided by J.D.L.R. At the direction of agents, CS accepted the contract, and Milwaukee DEA agents coordinated with DEA agents in Denver, Colorado, to complete the money pickup.

      A.     DEA agents in Colorado, using an undercover agent (UC), were telephonically contacted by an unknown male to arrange for the pickup in Aurora, Colorado.

      B.     On December 11, 2023, the DEA Colorado agents established surveillance in the vicinity of the meet location. Agents saw a male exit his vehicle and enter the UC's vehicle. The male provided the UC with a bag determined to contain $55,980 in United States currency.

      C.     On December 11, 2023, the $55,980 that UC received from the male was then deposited into a DEA undercover account and converted to USDT, and 54,325.560503 USDT was sent to a deposit address ending in a7837bc6, as directed by J.D.L.R. through CS.

45.     Analysis of the publicly-available blockchain showed that on December 11, 2023, address ending in a7837bc6 sent 54,000 USDT to an address ending in a96f2fc7, which is an address held by Binance.

46.     Binance records for the address ending in a96f2fc7 show that the address was associated with a Binance account registered to J.D.L.R., with a Binance user ID ending in 8245. According to IP login information, J.D.L.R. commonly logged in from Guadalajara, Mexico, and other locations in Mexico.

13

47.    Binance records further show that on December 12, 2023, J.D.L.R. sent 54,320 USDT from his Binance account to address ending in ntSJPAPi ("address ntSJPAPi"), which is the address from which the defendant approximately 2,005,822.786651 Tether (USDT) cryptocurrency was seized.

48.    Based on their training and experience, and the investigation to date, agents believe that the proceeds of the $55,980 December 2023 money laundering contract were transferred from the broker account to address ntSJPAPi.

49.    Records for address ntSJPAPi show that from on or around November 3, 2023, through on or around April 27, 2024, there was a total of approximately $16,498,233 of cryptocurrency deposits into address ntSJPAPi and approximately $14,493,950 of cryptocurrency withdrawals from address ntSJPAPi.

50.    Based on their training and experience, and the investigation to date, agents believe that address ntSJPAPi had historically been used to store the proceeds of money laundering contracts and to conceal and disguise the nature, location, source, and ownership of drug trafficking activities.

51.    Address ntSJPAPi was categorized as an unhosted wallet, meaning it was not connected to a virtual currency exchange that would require Know Your Customer (KYC) information.[9]  Based on their training and experience, and the investigation to date, agents know that money launderers commonly use unhosted wallets to remain anonymous and avoid law enforcement detection.

52.    With an unhosted wallet, a user needs "gas" to send USDT via the Ethereum or Tron network.  Gas is the fee required to successfully conduct a transaction or execute a contract

---

[9] KYC is the process that banks and other financial institutions use, in part, to verify a customer's identity when opening an account.

on the Ethereum or Tron blockchain platform. By following the trail related to "gas fees," agents can connect individuals associated with the unhosted wallet because "gas fees" can generally be traced to a virtual currency exchange that requires KYC.

53. According to records for address ntSJPAPi, the first "gas fee" transaction was an incoming deposit on November 3, 2023, of 60.309215 TRX cryptocurrency from an address ending in v9TXc32G, associated with Binance, having a transaction hash ending in 32a697c1.

54. Binance records for transaction hash ending in 32a697c1 show that the gas fee deposit of 60.309215 TRX cryptocurrency into address ntSJPAPi was from a Binance account registered to an individual having the initials D.M.R. and a Binance user ID ending in 6563. According to IP login information, D.M.R. commonly logged in from Culiacan, Mexico, with phone number +52-6673XXXXXX and e-mail address dany_mXXXXXX@hotmail.com associated with the account.

55. Binance records for D.M.R.'s account show another connection to a money pickup brokered by J.D.L.R.

    A.    On October 5, 2023, DEA agents in Michigan conducted a money pickup of $62,000 of suspected drug proceeds in Detroit, Michigan.

    B.    On October 5, 2023, the $62,000 received from the money pickup was then deposited into a DEA undercover account, converted to USDT, and 60,122.367431 USDT was sent to address ending in a7837bc6, as directed by J.D.L.R. through CS.

    C.    On October 5, 2023, address ending in a7837bc6 sent two transactions to address ending in e37f618d. The first transaction was a suspected "test transaction" of 10 USDT to verify the account and the successful transaction, followed by a second transaction of 58,270 USDT. Address ending in e37f618d was a deposit address listed on D.M.R.'s Binance account.

56. Based on their training and experience, and the investigation to date, agents believe that D.M.R. controls, or is directly associated with the person who controls, address ntSJPAPi,

which is the address from which the defendant approximately 2,005,822.786651 Tether (USDT) cryptocurrency was seized.

57.     Furthermore, based on their training and experience, and the investigation to date, agents believe that J.D.L.R. had D.M.R. store the proceeds of money laundering contracts and conceal and disguise the nature, location, source, and ownership of drug trafficking proceeds.

58.     Agents further traced the original 54,320 USDT sent to address ntSJPAPi on December 12, 2023, (as noted in paragraph 47) and found that it was combined with the following three additional deposits:

        A.     A deposit of 87,500 USDT on December 11, 2023, from sub-address ending in Z5khZEHV ("sub-address Z5khZEHV");

        B.     A deposit of 125,000 USDT on December 11, 2023, from sub-address ending in 3ximFyMM ("sub-address 3ximFyMM"); and

        C.     A deposit of 230,000 USDT on December 11, 2023, from sub-address ending in w87bbyh3 ("sub-address w87bbyh3").

59.     On December 12, 2023, address ntSJPAPi combined the four deposits mentioned in paragraph 58 and sent 499,990 USDT to address ending in DbbpzqLS.

60.     Records for D.M.R.'s Binance account show two withdrawals – one of 9 USDT and one of 199,991 USDT – on August 22, 2023, from D.M.R.'s Binance account to sub-address Z5khZEHV (identified in paragraph 58A).

61.     Records for D.M.R.'s Binance account also show three withdrawals – one of 9 USDT, one of 40,000 USDT, and one of 49,991 USDT – on August 25, 2023, from D.M.R.'s Binance account to sub-address w87bbyh3 (identified in paragraph 58C).

62.     Records for address ntSJPAPi show characteristics of money laundering activity, including but not limited to the following:

        A.     The establishment of the account followed by a rapid movement of cryptocurrencies into and out of the account over short periods of time;

B.    Large dollar equivalent amounts of cryptocurrency transactions in and out of the account that often, but not always, result in a near net zero or relatively small dollar ending balance (until after approximately April 8, 2024);

C.    A relatively short duration of use of the account; and

D.    A flow of cryptocurrency funds to user accounts owned by individuals in narcotic source countries (e.g., Mexico and Colombia), consistent with transactions DEA has observed in undercover operations.

63.    Beginning on or about April 8, 2024, address ntSJPAPi began accumulating a balance, including a 448,564 deposit on April 20, 2024, from address ending in VLh1Y2Kt, which was an unhosted wallet.

64.    Records for address ending in VLh1Y2Kt show the first "gas fee" deposit of TRX was a deposit of 621.942118 TRX on March 22, 2024, from address ending in WfhWcVg5.

65.    Records show that address ending in WfhWcVg5 sent two transactions – one of 10 USDT and one of 150,000 USDT – on February 7, 2024, to sub-address ending in Z5khZEHV (identified in paragraph 58A).

66.    Records further show that address ending in WfhWcVg5 had 49 transactions with address ntSJPAPi, sending approximately $3,060,000 of cryptocurrency and receiving approximately $795,800 of cryptocurrency.

67.    Records also show that address ending in WfhWcVg5 had received two transactions – one of 1 USDT on November 2, 2023, and one of 1 USDT on December 2, 2023 – and one transaction of 300,000 USDT on December 2, 2023, from sub-address w87bbyh3 (identified in paragraph 58C).

68.    Based on their training and experience, and the investigation to date, agents believe address ntSJPAPi, sub-address Z5khZEHV, sub-address 3ximFyMM, and sub-address w87bbyh3 were being used by this money laundering network, of which D.M.R. was a part, to facilitate the

17

movement of illegal proceeds derived from the sale of narcotics, and to obfuscate the true origin of the funds.

**Connection to another DEA investigation**

69.     DEA agents in Chicago, Illinois, had a money laundering investigation in Chicago, Illinois. In that investigation, in January 2024, agents conducted a money pickup of greater than $75,000.  A DEA Chicago confidential source was directed by the target of their investigation to send the trafficker-directed funds from that pickup to cryptocurrency wallet address ending in 8vMKECs7 ("address 8vMKECs7").  Address 8vMKECs7 had received approximately $61,030 of cryptocurrency from address ntSJPAPi. Address 8vMKECs7 also had other transactions with sub-address Z5khZEHV, sub-address 3ximFyMM, and sub-address w87bbyh3 referenced in paragraph 58.

> A.     Records for address 8vMKECs7 and sub-address Z5khZEHV show 39 total transactions from July 2023 to February 2024, with approximately $498,100 in cryptocurrency being sent from address 8vMKECs7 to sub-address Z5khZEHV, and approximately $3,070,000 in cryptocurrency being sent from sub-address Z5khZEHV to address 8vMKECs7.

> B.     Records also show one transaction of 115,569 USDT sent from sub-address 3ximFyMM to address 8vMKECs7 on August 17, 2023.

> C.     Records further show two transactions on December 14, 2023, totaling 200,001 USDT from sub-address w87bbyh3 to address 8vMKECs7.

70.     Based on their training and experience, and the investigation to date, agents believe that address 8vMKECs7 (the deposit address provided to the DEA Chicago confidential source) and address ntSJPAPi (the address from which the defendant approximately 2,005,822.786651 Tether (USDT) cryptocurrency was seized) were involved in the same international money laundering operation, connected to D.M.R. and others, to facilitate the movement of illegal proceeds derived from the sale of narcotics and to obfuscate the true origin of the funds.

**Warrant for Arrest In Rem**

71.     Upon the filing of this complaint, the plaintiff requests that the Court issue an arrest warrant *in rem* pursuant to Supplemental Rule G(3)(b), which the plaintiff will execute upon the defendant property pursuant to 28 U.S.C. § 1355(d) and Supplemental Rule G(3)(c).

**Claim for Relief**

72.     The plaintiff repeats and incorporates by reference the paragraphs above.

73.     By the foregoing and other acts, the defendant property, approximately 2,005,822.786651 Tether (USDT) cryptocurrency from cryptocurrency address ending in ntSJPAPi, represents proceeds of distribution of controlled substances and a conspiracy to distribute, manufacture, dispense, or possess with the intent to manufacture, distribute, or dispense controlled substances, in violation of 21 U.S.C. §§ 841(a)(1) and 846.

74.     The defendant approximately 2,005,822.786651 Tether (USDT) cryptocurrency from cryptocurrency address ending in ntSJPAPi is therefore subject to forfeiture to the United States of America under 21 U.S.C. § 881(a)(6).

75.     By the foregoing and other acts, the defendant property, approximately 2,005,822.786651 Tether (USDT) cryptocurrency from cryptocurrency address ending in ntSJPAPi, (1) was involved in, or is traceable to funds involved in, money laundering transactions and a conspiracy to engage in money laundering in violation of 18 U.S.C. §§ 1956 and 1957; and (2) was involved in, or is traceable to funds involved in, unlicensed money transmitting in violation of 18 U.S.C. § 1960.

76.     The defendant approximately 2,005,822.786651 Tether (USDT) cryptocurrency from cryptocurrency address ending in ntSJPAPi is therefore subject to forfeiture under 18 U.S.C. §§ 981(a)(1)(A) and 984.

WHEREFORE, the United States of America prays that a warrant of arrest for the defendant property be issued; that due notice be given to all interested parties to appear and show cause why the forfeiture should not be decreed; that judgment declare the defendant property to be condemned and forfeited to the United States of America for disposition according to law; and that the United States of America be granted such other and further relief as this Court may deem just and equitable, together with the costs and disbursements of this action.

Dated at Milwaukee, Wisconsin, this 10th day of December, 2024.

Respectfully submitted,

GREGORY J. HAANSTAD
United States Attorney

By:     *s/Elizabeth M. Monfils*
ELIZABETH M. MONFILS
Assistant United States Attorney
Wisconsin Bar No. 1061622
Office of the United States Attorney
Eastern District of Wisconsin
517 E. Wisconsin Avenue, Room 530
Milwaukee, WI 53202
Telephone: (414) 297-1700
Fax: (414) 297-1738
E-Mail: elizabeth.monfils@usdoj.gov

**Verification**

I, Kellen Williams, hereby verify and declare under penalty of perjury that I am a Special Agent with the Drug Enforcement Administration ("DEA"), that I have read the foregoing Verified Complaint for Civil Forfeiture *in rem* and know the contents thereof, and that the factual matters contained in paragraphs 10 through 70 of the Verified Complaint are true to my own knowledge.

The sources of my knowledge are the official files and records of the United States, information supplied to me by other law enforcement officers, as well as my investigation of this case, together with others, as a Special Agent with the DEA.

I hereby verify and declare under penalty of perjury that the foregoing is true and correct.


Date: 12/10/2024                                  *s/Kellen Williams*
                                                  Kellen Williams
                                                  Special Agent
                                                  Drug Enforcement Administration